TRB:ems 04-227 8/17/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RGP DENTAL, INC.

V. C.A. No. 04-445 ML

CHARTER OAK FIRE INSURANCE
COMPANY

**RGP DENTAL, INC.'S OBJECTION TO
CHARTER OAK FIRE INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

Now comes plaintiff RGP Dental, Inc. to object to Charter Oak Fire Insurance Company's motion for summary judgment. Plaintiff submits the accompanying memorandum of law in support of its objection.

Plaintiff
RGP Dental, Inc.
By its Attorneys,

HANSON CURRAN LLP

David P. Whitman (by MD)

David P. Whitman, Esq. #0552

Thomas R. Bender

Thomas R. Bender, Esq. #2799
146 Westminster Street
Providence, RI 02903-2202
(401) 421-2154 – telephone
(401) 521-7040- fax

Plaintiff
RGP Dental, Inc.
By its Attorneys,

HANSON CURRAN LLP

David P. Whitman, Esq. #0552

Thomas R. Bender, Esq. #2799
146 Westminster Street
Providence, RI 02903-2202
(401) 421-2154 – telephone
(401) 521-7040- fax

**PROOF OF SERVICE**

I hereby certify that on this 18 day of August, 2005, I mailed a true and accurate copy of the within document to **James A. Ruggieri, Esq.**, Higgins, Cavanagh & Cooney, LLP, The Hay Building, 123 Dyer Street, Providence, RI 02903-3987 and **Laura A. Brady, Esq., Frederick P. Marczyk, Esq.**, Drinker Biddle & Reath LLP, 500 Campus Drive, Florham Park, NJ 07932-1047.

of Hanson Curran LLP

TRB:ems 04-227 8/15/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RGP DENTAL, INC.

V. C.A. No. 04-445 ML

CHARTER OAK FIRE INSURANCE
COMPANY

## RGP DENTAL, INC.'S MEMORANDUM OF LAW IN REPLY TO CHARTER OAK'S MOTION FOR SUMMARY JUDGMENT AND OBJECTION TO RGP'S MOTION FOR SUMMARY JUDGMENT

### Introduction

In this memorandum RGP responds to the arguments and authorities set forth in both Charter Oak's objection and its cross-motion for summary judgment.

### Argument

**I.) When viewed from the perspective of an ordinary reader the policy obligates Charter Oak to defend RGP.**

**A.) "Infringement of . . . title."**

Charter Oak has cited and discussed a substantial number of cases rejecting the proposition that "title," as used in the policy phrase "infringement of . . . title," can mean what

dictionaries say it can mean -- the legal right to control property or a claim.[1] The dispositive point is not numbers, however, it is methodology, and the methodology of these cases is wholly incompatible with Rhode Island law.

None of the cases reject the contention that dictionaries demonstrate that title can mean either, 1) a descriptive heading or identifying name, or 2) the elements that make up the legal right to control property or a claim. Some expressly acknowledge it.[2] But these cases nevertheless limit its meaning to a descriptive heading or identifying name, not by reference to a limiting definition expressly set forth in the policy, but rather by an analysis of the context in which it is used.[3] They then draw from that analysis what the *insurer* must have intended under

---

[1] *See, e.g., The American Heritage Dictionary of the English Language* (3rd Ed. 1992) at 416.

[2] *See, e.g., Sunex International, Inc. v. Travelers Indemnity Company of Illinois*, 185 F.Supp.2d 614, 620-21 (D.S.C. 2001); *Heritage Mutual Insurance Company v. Advanced Polymer Technology, Inc.*, 97 F.Supp. 913, 922 (S.D. Ind. 2000); *Owens-Brockway Glass Container, Inc. v. International Insurance Company*, 884 F.Supp. 363, 367 (E. Cal. 1995); *Maxconn v. Track Insurance Exchange*, 74 Cal. App. 4th 1267, 1275, 1277, 88 Cal. Rptr. 750, 755, 756 (1999); *Julian v. Liberty Mutual Insurance Company*, 43 Conn. 281, 284, 288, 682 A.2d 611, 613, 615 (1996).

[3] *See, e.g., U.S. Test, Inc. v. NDE Environmental Corp.*, 196 F.3d 1376, 1381 (Fed. Cir. 1999) ("We concur with the reasoning of several other courts that have construed "title," *when grouped together with* "slogan" and "copyright," to mean "name," *e.g.*, the name of the literary or artistic work") (emphasis added); *Sunex*, 185 F.3d at 621 ("the plain terms of the policies *and the context* in which they are used demonstrate that the use of the term title clearly is meant as the title of a work or as a name, not a formal property right") (emphasis added); *Heritage Mutual*, 97 F.Supp.2d at 922 ("We are not unaware that dictionaries attribute multiple meanings to the word "title" * * * [but must resort to] the context and contours of the entire insurance policy in which it appears"); *Owens-Brockway*, 884 F.Supp. at 367 (expansive dictionary definition not reasonable when "title" is examined in the context of its use); *Maxconn*, 74 Cal. App. 4th at 1273, 88 Cal. Rptr. at 753 (language "must be construed in the context of [the] instrument as a whole, and in the circumstances of that case"); *Julian*, 43 Conn. at 287 ("the meaning of policy language should ordinarily be drawn from the context in which it is used").

such a policy[4] -- a meaning more limited than the ordinary and usual meaning as found in dictionaries.

As set forth in RGP's initial memorandum, however, under Rhode Island law a court interpreting an insurance policy does not look to what the insurer intended by the words, but rather, to the words' ordinary meaning and how those words would be understood by an ordinary reader and purchaser of the policy. *See, e.g., Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1215 (R.I. 2004). And to determine "[t]he plain and ordinary meaning of [a] word as it would be understood by reasonable policyholders" the Rhode Island Supreme Court will examine its dictionary definition.[5]

While acknowledging that the word "title" has several different commonly understood meanings, one of which would encompass trademark infringement, the authorities cited by Charter Oak hold that the context within which the word is used in the policy demonstrates the *insurer's* intent to limits its meaning. *See, e.g., Maxconn*, 74 Cal. App. 4th at 276, 81 Cal. Rptr.

---

[4] *See, e.g., U.S. Test, Inc.*, 196 F.3d at 1381 ("this argument is a strained attempt to contort the plain meaning of the provision into providing coverage for all acts *not intended* to be covered by the policy [drafted by the insurer]") (emphasis added); *Sholedge v. Travelers Indemnity Company of Illinois*, 168 F.3d 256, 260 (6th Cir. 1999) ("It is unreasonable to assume that the insurers would have enumerated all of the other covered offenses, such as copyright, . . . but chosen not to list the commonly recognized offense of trademark infringement"); *Sunex International*, 185 F.Supp.2d at 617 ("if the *intention* of the *parties* is clear, the court has no authority to torture the meaning of policy language or to extend or defeat coverage that was *never intended by the policy*") (emphasis added); *Heritage Mutual*, 97 F.Supp.2d at 918 ("to ascertain and give effect to the mutual intention of the parties"); *Maxconn*, 74 Cal. App. 4th at 1273, 88 Cal. Rptr. at 753 (ambiguous terms "must be interpreted in the sense in which the *insurer believed* that the insured understood them at the time the policy was made") (emphasis added).

[5] *DeCesare v. Lincoln Benefit Life Company*, 852 A.2d 474, 485 (R.I. 2004). *See also Elgar v. National Continental/Progressive Insurance Company*, 849 A.2d 324, 328 (R.I. 2004); *American Commerce Insurance Company v. Porto*, 811 A.2d 1185, 1198-99 (R.I. 2002); *Textron, Inc. v. Aetna Casualty and Surety Company*, 754 A.2d 742, 748 (R.I. 2000); *Sjogren v. Metropolitan Property and Casualty Insurance Company*, 703 A.2d 608, 611 (R.I. 1997);

at 755-56 ("We do not believe the drafters of the policy intended . . ."). This approach is wholly at odds with the analytical approach the Rhode Island Supreme Court would apply to the interpretation of a policy. First, the insured's intent is not controlling. Second, the words are to be given their plain, ordinary everyday meaning -- a meaning commonly found in dictionaries. And third, the Rhode Island Supreme Court would not require the average policyholder to engage in the lengthy and complex judicial analysis of the policy, as found in Charter Oak's authorities, to determine if the meaning of title was *implicitly* limited. The Court would instead examine whether the policy *expressly* defined title *to eliminate* one of its ordinary and usual meanings. *See Bartlett v. Amica Mutual Insurance Company*, 593 A.2d 45, 48 (R.I. 1991). Since title has multiple ordinarily understood meanings, and is therefore an inherently ambiguous term, Rhode Island principles of insurance policy interpretation require that "infringement of . . . title" be construed in favor of coverage.[6]

Moreover, the Rhode Island Supreme Court has held that "diversity of judicial thought as to the meaning of terms in an insurance policy is proof positive of ambiguity." *Textron, Inc. v. Aetna Casualty and Surety Company*, 754 A.2d 742, 749 (R.I. 2000). The existence of different judicial interpretations of "infringement of . . . title" outside this jurisdiction would be a very substantial, if not dispositive, indicator of ambiguity requiring a construction of the phrase in favor of coverage.

---

*Campbell v. Norfolk & Dedham Mutual Fire Insurance Company*, 682 A.2d 933, 936 (R.I. 1996).

[6] Many of Charter Oak's authorities speak of refraining from "torturing" the meaning of "title." That characterization is misapplied here, because to "torture" the meaning of a word is to force upon it an unnatural, unusual or extraordinary meaning. Here, RGP seeks to have the Court apply an undeniably ordinary and usual meaning of the word "title"-- where there are several -- and Charter Oak asserts the Court should eliminate that meaning from consideration. RGP's

**B.) Under Rhode Island's approach to insurance coverage "passing off," trademark and trade dress infringement are inherently advertising activities that allegedly caused Support Design's injuries.**

As stated in the previous section Rhode Island holds diversity of judicial thought on the meaning of insurance policy terms "is proof positive of ambiguity." *Textron, Inc.*, 759 A.2d at 749. That is exactly what this Court is faced with in determining the meaning to be applied to the term "advertising activity"; or more precisely, whether the infringement of Charter Oak's trademarked seat design occurred during the course of advertising activity and caused its damages. RGP has presented the Court with several authorities holding trademark offenses under the Lanham Act are inherently advertising activities because the protected mark or dress functions to favorably associate the product with a particular company and to encourage people to purchase it for that reason. (See RGP Mem. at 12-14). Since the dictionary definition of "advertising" includes "[t]he activity of attracting public attention to a product or business[,]" *American Heritage Dictionary, supra* at 26, and these courts conclude that is the function of a trademark or trade dress, these courts hold that using the mark constitutes advertising. (See RGP Mem. at 11-14).

On the other, Charter Oak has presented the Court with authorities that interpret "advertising activity" more narrowly, notwithstanding its dictionary definition. *See, e.g. Sport Supply Group, Inc. v. Columbia Casualty Company*, 355 F.3d 453, 462-63 (5th Cir. 2003) (applying Texas law); *Ecko Group, Inc. v. Travelers Indemnity Company of Illinois*, 273 F.3d 409, 413-14 (1st Cir. 2001) (applying N.H. law). They reject applying the dictionary definition to

---

position seeks to apply the word according to its broadly usual meaning, while Charter Oak seeks to cabin its meaning because of a lengthy judicial analysis of "context."

the policy language because of the belief "it requires one to read at least some of the policy language unnaturally." *Ecko*, 273 F.3d at 413.

*Ecko*, the principle authority relied upon by Charter Oak, acknowledged that "the dictionary also permits the term 'advertising' to be used, with equal legitimacy in the eyes of the lexicographers, to mean any form of 'calling attention' to something else." *Id.* at 414. But the Court nevertheless concluded that describing product copying as advertising "is surely a very strained way to speak." *Id.* at 413-14. Acknowledging "two different concepts of advertising," and that "the bare language of the policy is not conclusive," the court chose the more narrow meaning despite the ambiguity. *Id.* at 414. The question for this Court is which path would Rhode Island law follow. Given the Rhode Island Supreme Court's habit of seeking ordinary meaning from the dictionary, its belief that divergent judicial views are proof of ambiguity, and its direction that ambiguous terms are to be construed in favor of coverage, RGP asserts it would find the alleged infringing activity here to be "advertising activity" that caused Support Design's alleged injuries. Therefore this Court should also.

**II.) The policy exclusions raised by Charter Oak do not excuse its failure to defend.**

In addressing the applicability of the four exclusions relied upon by Charter Oak the Court must analyze them against the backdrop of three important principles. First, "an exclusion from coverage in [an] insurance policy must be clear and unambiguous[,]" and second, "[i]f the terms of an insurance contract are subject to more than one reasonable interpretation, the policy will be construed in favor of the insured to avoid forfeiture." *American Commerce Insurance Company v. Porto*, 811 A.2d 1185, 1192 (R.I. 2002) (quoting *Campbell v. Norfolk & Dedham Mutual Insurance Co.*, 682 A.2d 933, 935 (R.I. 1996)). Third, "any doubts about the adequacy of

the pleadings to encompass an occurrence within the scope of the policy must be resolved in the insured's favor." *Allstate Insurance Co. v. Russo*, 641 A.2d 1304, 1306 (R.I. 1994).

**A.) The "failure of goods to conform" exclusion does not apply.**

Pointing to the exclusion for advertising injury arising out of *"the failure of goods, products or services to conform with advertised quality or performance,"* Charter Oak asserts coverage for Sun Design's claims is excluded because RGP's advertising of the dental chairs "created a false impression that the counterfeit chairs were affiliated with Support Design." (Charter Oak Mem. at 17). Without citation to authority, Charter Oak asserts Support Design's injury is not covered because its claims are premised on allegations the insured "conveyed to the public a false impression that the goods, products or services it advertised were affiliated with another company when, in fact, they were not[,]" and that constitutes a failure of the goods to conform to their advertised quality.

This precise argument was rejected by the court in *Floodine v. State Farm Insurance Co.*, 2001 WL 204786 (N.D. Ill.), and given Rhode Island law's inclination to avoid forfeiture where at all reasonable, its rationale is compelling. The insured, Floodine, was sued by J.C. Penney which claimed she had misrepresented the origin of certain goods, falsely suggesting they were produced by American Indians, and was guilty of "passing off" the goods in question. *Id.* at 1, 3. When she sought a defense from State Farm it declined, asserting *inter alia*, that the alleged misrepresentation of the nature and origin of the goods was subject to the exclusion for injury "arising from the failure of goods, products or services to conform with advertised quality or performance." *Id.* at 4. The Federal District Court rejected the claim, observing that State Farm was asking the Court to read the word "quality" to mean "attribute." The Court wrote:

> When read in the context of the entire sentence, "quality" has the more specific meaning of "excellence", this exclusion bars coverage for claims arising from the failure of the insured's products to perform as well as advertised. *Though trademarks and/or designation of authenticity* can be indicators of quality (in the sense of excellence) to consumers, *they are primarily concerned with identifying the source or origin of goods, not how well the goods will perform.*

*Id.* at 12 (emphasis added). Consequently, given at least two reasonable interpretations of the word "quality" the Court declined State Farm's invitation to apply the broad meaning. It applied a reasonable construction that avoided forfeiture of coverage.

That same analysis would apply here. The theme of Support Design's claims is that RGP is wrongfully using a trademarked seat design creating confusion in the minds of the relevant consuming public as to whether the chairs originated with or were approved by Support Design when they were not. The claims do not involve any injury arising out of a failure of the chairs to perform in a certain way or be of a certain quality.

**B.) The breach of contract exclusion does not apply.**

Charter Oak also points to the exclusion that withdraws coverage for advertising injury arising out of "*breach of contract*." The short answer to that argument is that the injuries claimed by Support Design arose out of alleged trademark infringement, not the alleged breach of the distribution agreement which was terminated for nonpayment prior to any of the alleged infringing activity.

Support Design's complaint alleges RGP was formally authorized to distribute and sell dental chairs incorporating the trademarked seat design, and then purchased seats and seatbacks incorporating the design from Sun Design's Swedish distributor. (RGP App. at 3). The

complaint further alleges that when RGP failed to pay for chairs it had ordered and received, the distribution agreement was "terminated." (*Id.*). Support Design then claims RGP subsequently began to manufacture dental chairs incorporating the seat design and to distribute and sell them. (*Id.*). More importantly, the complaint does not contain a breach of contract claim, instead it seeks damages for infringement of the trademarked seat design, not breach of the distribution agreement for nonpayment or even for use of the seat design.

Charter Oak asserts the claims by Support Design "flow from" and "have their origin in" RGP's breach of the distribution agreement. (Charter Oak Mem. at 17). According to Charter Oak "[i]f RGP had not breached, it would not have lost the right to use the trademarked seat design and, therefore, of course, would not have been sued for trademark infringement." (*Id.*). The three cases Charter Oak relies upon, however, all involve ongoing contractual relationships between the plaintiff and the insured, and the alleged breach *is the infringing activity.* For example, in *Callas Enterprises, Inc. v. Travelers Indemnity Company of America*, 193 F.3d 952 (8th Cir. 1999), the insured Callas sold floor matting products manufactured by its contractual business partner under an agreement that gave it exclusive right to sell the product in a three state area if Callas agreed not to sell floor matting manufactured by anyone else. 193 F.3d at 954. The business parties sued, however, alleging Callas did sell other floor matting, and did so by soliciting the parties' customers and obtained orders showing them samples of the partner's floor matting, but delivering a different manufacturer's matting or a different grade or type of the partner's matting. *Id.* at 959. The partners sued Callas for breach of contract, unfair competition and a violation of the Lanham Act. *Id.* In *Callas*, the breach of contract *was* the Lanham Act violation or infringement. Likewise, in *Pennsylvania Pulp & Paper Company v. Nationwide Mutual Insurance Company*, 100 S.W.3d 566 (Tex. App. – Houston [14th Dist.] 2003), the

insured was a party to a "nontransferable license agreement." *Id.* at 571-72. When *Pennsylvania Pulp* was sued by the other party for breach of the licensing agreement and patent infringement among other claims, the Court found coverage was unavailable because the breach of contract was the patent infringement. Lastly, in *Southstar Corporation v. St. Paul Surplus Lines,* 42 S.W.3d 187 (Tex. 2000), there was written agreement finalizing the dissolution of a business. The agreement gave one of the parties the right to the corporate name and logo. When the insured allegedly engaged in the unauthorized use and misuse of the name it was sued for breach of the agreement and it sought coverage under the advertising injury portion of its policy with St. Paul. 42 S.W.2d at 189.

In each of these cases it was the infringing activity that gave rise to the breach of contract and thus the claimed injuries arose out of the breach of contract and infringing activity simultaneously.

To the extent Support Design suffered injury here it did not arise out of the breach of the distribution agreement. It does not allege RGP engaged in any infringing activity during the existence of the agreement that constituted a breach and warranted termination. Instead it was terminated for a nonadvertising injury – nonpayment. The alleged infringing activity that caused injury to Support Design occurred after the contract was terminated for wholly separate reasons. Even defining "arising out of" to mean "flowing from" or "having its origin in," *Porto,* 811 A.2d at 1194, there is no causal connection between the breach -- nonpayment of fees -- and the claimed trademark injuries. Those alleged injuries arose out of, flowed from, and had their origins in the post-agreement infringing activity. If RGP engaged in wrongful conduct, it was wrongful because of trademark law alone, not because of a simultaneous breach of contract

because of infringing activity. The "breach of contract" exclusion has no application to this matter.

**C.) Neither the "knowledge of falsity" nor the "willful violation of a penal statute" exclusions apply.**

A third exclusion relied upon by Charter Oak is the "knowledge of falsity" exclusion, which excludes coverage for advertising injury arising out of "*oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.*" Charter Oak asserts the Support Design complaint "makes clear" that RGP's advertising of the alleged counterfeit chairs "was necessarily published by RGP with full knowledge of its falsity." (Charter Oak Mem. at 13). That is, that the seat design conveyed a false impression of its origin. Charter Oak argues that "it is impossible to read the underlying complaint to potentially allege that RGP infringed the trademarked seat design by accident or that the copy-cat counterfeit chairs accidentally implied an affiliation between RGP and Support Design." (*Id.*).

Two Circuit Court of Appeals have addressed the "knowledge of its falsity" phrase in this exclusion and have determined that it is susceptible to two reasonable meanings. *See State Auto Property and Casualty Insurance Company v. Travelers Indemnity Company of America*, 343 F.3d 249 (4th Cir. 2003); *Hyman v. Nationwide Mutual Fire Insurance Co.*, 304 F.3d 1179 (11th Cir. 2002). In *State Auto Property*, Travelers asserted, as Charter Oak does here, that the knowledge of falsity exclusion applied because the underlying complaint alleged that the insured "acted intentionally and willfully in misleading consumers" as to the origin of the product. 343 F.3d at 260. Adopting the reasoning of the Eleventh Circuit in *Hyman*, the Fourth Circuit noted the term falsity was not defined in the policy but that the term "false" was generally understood

to mean "untrue" or "failing to correspond to a known set of facts." *Id.* While one construction of the term false might encompass conduct or statements arguably giving rise to a false or misleading "impression" -- for example, of the origin of a product -- another reasonable meaning of "false" was one including "only direct assertions of untrue facts." *Id.* (citing *Hyman*, 304 F.3d at 1195). Both interpretations were equally plausible and because applicable North Carolina law, like Rhode Island law, required construing ambiguous policy provisions in favor of coverage the court found the exclusion was inapplicable, because the knowledge of falsity exclusion does not apply to allegations of the wrongful utilization of a trademark in the absence of a direct assertion of untrue fact. *Id.* Rhode Island law with respect to the interpretation of exclusionary clauses compels the same result here.

Creating the likelihood of confusion by designing a product similar in appearance to a competitors' by itself does not constitute oral or written publication of material with knowledge of its falsity. *State Auto Property*, 343 F.3d at 260; *Hyman*, 304 F.3d at 1195. For the exclusion to apply there must be evidence (or in the context of a duty to defend an allegation in the complaint) of a statement of fact or direct misrepresentation of the origin of the product, *id.*, and Charter Oak cannot point to any such direct assertion of an untrue fact.

Aside from the meaning and scope of the knowledge of falsity exclusion, however, there is a second reason why the exclusion does not obviate Charter Oak's duty to defend the underlying complaint. Charter Oak's assertion that "it is impossible to read the underlying complaint to potentially allege" an unintentional trademark infringement simply ignores the allegations of the complaint and the nature of Lanham Act violations.

Support Design's complaint alleges its action "arises under the Trademark At of 1946, as amended, Title 15, United States Code §1501 *et seq.* (RGP App. at 1). Count I alleges RGP has

acted "in violation of Support Design's rights in and to the Seat Design trademark under 15 U.S.C. §1114[,]" and that *"[u]pon information and belief,* Defendant has acted with full knowledge of Support Design's rights, with the intention to usurp such rights, and with the knowledge that such acts are causing confusion or are likely to cause confusion in the relevant marketplace." (*Id.* at 4). Count III, alleging common law trademark infringement and unfair competition, also makes its allegations of willful and knowing use of the trademark "[o]n information and belief." (*Id.* at 6). Several courts have recognized that §1114 of the Lanham Act does not uniformly require that infringements be committed with knowledge. *See, e.g., Central Mutual Insurance Company v. Stunfence, Inc.*, 292 F.Supp.2d 1072, 1081 (N.D. Ill. 2003); *Aldolfo House Distributing Corp. v. Travelers Property and Casualty Insurance Co.*, 165 F. Supp. 1332, 1341 (S.D. Fla. 2001); *Bay Electric Supply, Inc. v. Travelers Lloyds Insurance Company*, 61 F.Supp.2d 611, 619 (S.D. Tex. 1999). The Lanham Act permits recovery for unintentional acts of trade dress infringement. *Id.* Here Count I refers to trademark infringement under 15 U.S.C. §1114 generally, and Support Design's allegations of both statutory and common law trademark infringement only allege knowing and willful infringement based upon information and belief –meaning they may or may not be knowing and willful. Consequently, Support Design's allegations of trademark infringement may fairly be read to encompass both intentional and unintentional infringement, and even if intentional trademark infringement was encompassed by the exclusion for oral or written publication of material done "with knowledge of its falsity," RGP would still be entitled to a defense because of the potential liability for unintentional trademark infringement.

It is for this same reason that Charter Oak's reliance on the exclusion for advertising injury arising out of the "*willful violation of a penal statute*" also fails. Charter Oak does not

assert the Lanham Act is a penal statute, rather it asserts that an intentional trademark infringement would be a violation of 18 U.S.C. §2320, entitled "Trafficking in Counterfeit Goods or Services." That statute makes it a crime to intentionally "traffic" in goods while knowingly using a counterfeit mark on or in connection with such goods. As just explained, however, the complaint fairly encompasses a claim for unintentional infringement which would not be a crime under §2320, and Charter Oak would therefore still have a duty to defend RGP in the Support Design action on the basis of that potential claim alone.

**III.) The late notice-prejudice rule bars forfeiture of the policy benefits under the facts claimed by Charter Oak.**

Charter Oak asserts RGP has forfeited the benefits of the policy including the right to a defense. The policy issued to RGP required that the carrier be notified of any offense that may result in a claim "as soon as practicable," and if a claim was made or suit brought, "as soon as possible." Any legal papers received in connection with the claim or suit had to be forwarded "immediately." Charter Oak asserts that because RGP received notice of Support Design's infringement claims in February and March 2002, and was served with the complaint in March 2003, its failure to give notice of the claim and lawsuit until August 2004 constituted a breach of the policy provisions and a forfeiture of coverage. (Charter Oak Mem. at 18). Not claiming any actual prejudice, Charter Oak asserts the delay constituted prejudice as a matter of law. (*Id.*).

In a long line of cases the Rhode Island Supreme Court has adhered to a "notice-prejudice" rule with respect to the notice provisions in insurance policies. Most recently, in *Canavan v. Lovett, Schefrin and Harnett*, 862 A.2d 778, 784 (R.I. 2004), the Court stated: "[i]n late notice cases, this Court has held that the insurance carrier has the burden to show that it was

prejudiced by the insured's late notice before it can declare a forfeiture of the bargained-for protection." (quoting *Avco Corp. v. Aetna Casualty & Surety Co.*, 679 A.2d 323, 329 (R.I. 1996).[7]

Charter Oak does not argue or attempt to demonstrate its handling of RGP's claim was in fact prejudiced because of the timing of the notice. Instead it asserts that under *Avco Corporation v. Aetna Casualty & Surety Company*, 679 A.2d 323 (R.I. 1996) and *O. Ahlborg & Sons, Inc. v. Travelers Indemnity Company*, 694 A.2d 750 (R.I. 1997) (order), prejudice must be presumed as a matter of law. There are two salient features of the *Avco* decision and the *O. Ahlborg & Sons* order, however, that rendered them poor templates for presuming prejudice *per se* in this matter.

First, neither of the carriers in those cases denied that the liability incurred by the insureds came within the coverage afforded by the policies, as Charter Oak has done here. Their claim was that the existing coverage was forfeited due to breaches of the contracts' notice provisions. Charter Oak, on the other hand, has consistently maintained the policy does not cover the claims brought against RGP by Support Design. As the court in *Bay Electric Supply, Inc. v. Travelers*

---

[7] *Accord, Pennsylvania General Insurance Company v. Becton*, 475 A.2d 1032, 1035 (R.I. 1984) ("An insured should not be barred from recovering the benefits for which he or she has paid because of a breach of the policy's notice provisions when there is no showing by the insurance carrier that it was prejudiced by the breach."); *A & W Artesian Well Co. v Aetna Casualty and Surety Co.*, 463 A.2d 1381, 1382 (R.I. 1983) ("[A] technical breach of notice provision in an insurance policy contract does not bar an insured from recovering on the policy[, r]ather the carrier must show it was prejudiced thereby."); *Siravo v. Great American Insurance Co.*, 122 R.I. 538, 540, 410 A.2d 116, 117 (1980) ('[A]n insurer [cannot] rely on any of the so-called 'notice' provisions of the policy unless it [can] demonstrate that it had been prejudiced by the lack of notice."); *Pickering v. American Employers Insurance Co.*, 109 R.I. 143, 160, 282 A.2d 584, 593 (1971) ("We do not believe that a technical breach of the notice provisions in a policy should bar an insured from recovering the benefits for which he has paid * * * The carrier has the burden of showing . . . prejudice.").

*Lloyds Insurance Company*, 61 F.Supp.2d 611 (S.D. Tex. 1999), stated in a materially identical situation:

> Travelers denial of coverage was not premised on late notice, but rather on its conclusion that the claims did not fall within the coverage. Thus, regardless of the timing of the notice, Travelers would have denied coverage and was therefore not prejudiced by the timing of the plaintiff's notice. Where, as here, the insurer would not have adjusted or defended the action regardless of the timing of the notice there is no reason to require a forfeiture of coverage merely upon a technicality.

*Id.* at 620. In fact in some states when an "insurer denies coverage based on an assertion that the underlying claim is excluded from coverage, there is a presumption that the [i]nsurer did not sufferer prejudice because prompt notice would have merely resulted in an earlier denial of coverage." *Zurich Insurance Company v. Sunclipse, Inc.*, 85 F.Supp.2d 842, 851 (N.D. Ill. 2000) (applying California law).

> [U]nder California law, when an insurer denies liability under a policy, it waives any claim that the insured did not comply with the notice provisions of the policy. * * * In its essence, this well-established rule prevents an insurer from relying on an insured's failure to perform a condition of the policy when the insurer has demonstrated that performance of the condition would not have altered its response to the claim.

*Id.* (citing *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 760-61, 15 Cal. Rptr. 815, 845 (1st Dist. 1993)). The carriers in *Avco* and *O. Ahlborg & Sons* did not deny coverage, instead they claimed their right to adjust or defend the claims was prejudiced by the late notice as a matter of law. Charter Oak, on the other hand, has never indicated any intent to adjust or defend the claim against RGP because of its belief that the claim is not covered. The timing of RGP's notice had no effect in fact or in law on Charter Oak's handling of the claim.

The second salient difference between *Avco* and *O. Ahlborg & Sons* and this matter is the fact the carriers in those cases did not receive notice of the claims until *after the insured's liability had been established.* There was nothing left to adjust or defend, moving the Rhode Island Supreme Court to conclude their right to adjust or defend the claims was prejudiced as a matter of law.

In *Avco* the insured did not notify the carrier of the various claims against it until it filed suit against the carriers seeking coverage for claims it had settled. 675 A.2d at 325. The Court noted that prior to seeking coverage from the carrier:

> Avco settled the claims brought against it by the water authority and by private citizens and also entered into consent agreements with [the Pennsylvania Department of Environmental Resources] and the EPA concerning the remedial actions to be taken in conjunction with the . . . site cleanup claims. The carriers . . . were . . . prevented from conducting any meaningful investigation of the various claims and thus had no input whatsoever into Avco's commitments to settle claims and make monetary payouts -- commitments for which Avco then demanded carrier coverage payments. * * * By the time Avco notified the carriers, there was nothing remaining for them to do except to assume and pay Avco's negotiated financial and expense commitments.

*Id.* at 329. In the brief order deciding *O. Ahlborg & Sons, Inc. v. Travelers Indemnity Company* the Court did not even speak of prejudice or refer to the notice-prejudice rule. However, the facts under which it affirmed summary judgment for the carrier because of a breach of a policy notice provision are instructive. There the insured general building contractor had a dispute with a subcontractor. When the subcontractor demanded arbitration the insured failed to notify Travelers. It was not until the claim proceeded to arbitration and an award was made against the insured that the insured sought reimbursement from the carrier. 694 A.2d at 751. Without saying so explicitly, the Court affirmed that delaying notification of a claim until after it is

adjudicated or settled satisfies the prejudice requirement of the notice-prejudice rule governing the forfeiture of insurance coverage.

Try as it might, Charter Oaks cannot shoe-horn itself into the per se prejudice facts of either *Avco* or *O. Ahlborg & Sons*. It has never taken a position that would suggest it would have adjusted or investigated the claim if it had earlier notice. By consistently taking the position there was no coverage for the claim it has waived any late notice argument, and since Support Design's claim has not been settled or adjudicated there is no basis for presuming prejudice as a matter of law under *Avco* in any event.[8]

**IV.) The "known loss" doctrine does not excuse Charter Oak's duty to defend because RGP had no legal obligation to pay damages and thus no known loss at the inception of the policy.**

Relying on the "known loss" doctrine and matters outside the complaint Charter Oak asserts it has no duty to defend RGP in the underlying lawsuit brought by Support Design because "RGP knew in February 2002, prior to the inception of the policy in May 2002, that Support Design claimed that RGP was infringing Support Design's rights to be trademarked seat design." (Charter Oak Mem. at 20). In answers to interrogatories, RGP acknowledged that prior

---

[8] At times Charter Oak seems to assert that *Avco* abrogated the prejudice requirement for "sophisticated corporations." (Charter Oak Mem. at 19). For example, soon after asserting "like the insurers in *Avco* and *Ahlborg*, Charter Oak was prejudiced by RGP's delay as a matter of law[,]" Charter Oak then claims "[t]he Rhode Island Supreme Court has made clear that no rational basis exists for this Court *to even consider whether RGP prejudiced Charter Oak*[.]" (*Id.*). While the Rhode Island Supreme Court has noted the rationale for the notice-prejudice rule was somewhat undercut where "the insured" is presumed to have more business acumen than the average consumer[,]" 679 A.2d at 330, the Court's decision was premised on a determination of prejudice as a matter of law. *Id.* at 329. To the extent the "business acumen" of the insurer plays any role at all, it only does so where the notice comes *after* judgment or settlement and the insurer is relieved of the burden of demonstrating prejudice because it is assumed in that circumstance.

to the inception of the policy it received two letters from Support Design in February 2002 claiming infringement of certain trademark rights, and a letter from Support Design's counsel to the same effect in March 2002. (Charter Oak's Exh. B). Charter Oak's assertion that these circumstances constituted a "known loss" that was uninsurable falls significantly short of the mark.

The known loss doctrine is a common law concept derived from the fortuity requirement in insurance law, preventing one from obtaining insurance for a loss that has either already taken place or is in progress. *Pittston Company Ultramar Limited v. Alliance Insurance Company*, 124 F.3d 508, 516 (3rd Cir. 1997). The Rhode Island Supreme Court has recognized a known loss doctrine that bars recovery of insurance proceeds "when an insured has knowledge, before the inception of the insurance policy, that the insured has suffered the threat of *an immediate economic loss*, as the result of some event, and that the *reality of that loss occurring is a certainty*." *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1218 (R.I. 2004) (quoting *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403, 415 (R.I. 2001)). In the context of third-party insurance the "economic loss" takes place sometime after the injurious event and for the purposes of the doctrine it is not a "known loss" until there is certainty about the imposition of liability and a legal obligation to pay has been established. *Kayser-Roth Corporation*, 770 A.2d at 415. Stated differently, when "there is uncertainty about the imposition of liability and no legal obligation to pay yet established, there is an insurable risk for which coverage may be sought." *Id.* (quoting *Montrose Chemical Corp. of California v. Admiral Insurance Co.*, 10 Cal. 4th 645, 913 P.2d 878, 905-06, 42 Cal. Rptr. 324 (1995)).

The Rhode Island Supreme Court's reliance on *Montrose Chemical* is instructive. There the California Supreme Court held that the "known loss" rule could not "defeat coverage for a claimed loss where it had yet to be established, at the time the insurer entered into the contract of insurance with the policyholder, that the insured had a legal obligation to pay damages to a third party in connection with a loss." *Id.* at 693, 913 P.2d at 906, 42 Cal. Rptr. at 352. The doctrine looks to whether the loss itself, not just the risk of loss, was known to the insured at the policy's inception. *Peck v. Public Service Mutual Insurance Company*, 363 F.Supp.2d 137, 145 n. 4 (D. Conn. 2005). The fact the insured might have received a letter indicating a lawsuit may follow, *Montrose*, 10 Cal. 4th at 690, 693, 913 P.2d at 904, 906, 42 Cal. Rptr. at 350-51, 352, or even that a lawsuit has been filed, *Peck*, 363 F.Supp.2d at 144, 146, is not sufficient to trigger the defense. The words of the California Supreme Court from *Montrose* are directly applicable here: "the fact that [RGP] knew it was more probable than not that it would be sued (successfully or otherwise) is not enough to defeat the potential of coverage (and consequently the duty to defend)." 10 Cal. 4th at 690, 913 P.2d at 904-05, 42 Cal. Rptr. at 351.

## Conclusion

For the above-stated reasons, and those set forth in RGP Dental, Inc.'s original memorandum of law in support of partial summary judgment, plaintiff asserts the damages claimed in Support Design's lawsuit potentially constitute covered advertising injuries caused by advertising activity. Consequently Charter Oak has a duty to defend RGP in the underlying action.

Plaintiff
RGP Dental, Inc.
By its Attorneys,

HANSON CURRAN LLP

David P. Whitman (by TRB)

David P. Whitman, Esq. #0552

Thomas R. Bender

Thomas R. Bender, Esq. #2799
146 Westminster Street
Providence, RI 02903-2202
(401) 421-2154 – telephone
(401) 521-7040- fax

**PROOF OF SERVICE**

I hereby certify that on this 18 day of August, 2005, I mailed a true and accurate copy of the within document to **James A. Ruggieri, Esq.**, Higgins, Cavanagh & Cooney, LLP, The Hay Building, 123 Dyer Street, Providence, RI 02903-3987 and **Laura A. Brady, Esq., Frederick P. Marczyk, Esq.**, Drinker Biddle & Reath LLP, 500 Campus Drive, Florham Park, NJ 07932-1047.

Thomas R. Bender

of Hanson Curran LLP